56 P.3d 875 (2002)
118 Nev. 681
Felipe DZUL, Appellant,
v.
The STATE of Nevada, Respondent.
No. 37880.
Supreme Court of Nevada.
October 31, 2002.
Rehearing Denied December 27, 2002.
*876 Marcus D. Cooper, Public Defender, and Sharon G. Dickinson, Deputy Public Defender, Clark County, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Stewart L. Bell, District Attorney, and James Tufteland, Chief Deputy District Attorney, Clark County, for Respondent.
BEFORE THE COURT EN BANC.

OPINION
By the Court, BECKER, J.:
Appellant Felipe Dzul pleaded guilty, pursuant to North Carolina v. Alford,[1] to one count of attempted lewdness with a child under the age of fourteen years for grabbing and squeezing the breast area of a nine-year-old girl. The district court accepted Dzul's guilty plea and thereafter ordered him to undergo a psychosexual evaluation pursuant to NRS 176.139. Dzul maintained his innocence throughout the psychosexual evaluation, asserting that he was hugging and tickling the child and never intended to sexually gratify himself. After receiving the Division of Parole and Probation's presentence investigation report, which included the reports of two psychological professionals who interviewed Dzul, the district court sentenced Dzul to four to ten years in prison.
On appeal, Dzul contends that he was entitled to Miranda[2] warnings prior to his psychosexual evaluation. Dzul further contends that his Fifth Amendment right against self-incrimination was violated because he was denied probation for maintaining his innocence throughout the psychosexual evaluation. Dzul points out that NRS 176A.110 conditions the grant of probation on a favorable psychosexual evaluation and asserts that a favorable psychosexual evaluation virtually always requires an admission of guilt by the defendant.[3] Dzul argues that this process violates his right against self-incrimination. We disagree with Dzul's contentions and, for the reasons set forth below, we affirm the judgment of conviction.

*877 FACTS

In December 2000, police responded to a report of child molestation at a Las Vegas apartment complex. The mother of nine-year-old Jane Doe[4] reported to police that her daughter went to return keys to Dzul's apartment and that Dzul invited the child inside and then grabbed and squeezed her breasts tightly. According to Jane Doe's mother, the distraught child ran from Dzul's apartment and immediately told her mother of the incident, including Dzul's warning not to tell her parents.
Based on those allegations and a records check, which revealed that Dzul was a registered sex offender with a previous conviction in 1980 for lewdness with a child, police contacted and arrested Dzul for lewdness with a child under the age of fourteen years. Dzul admitted playing with and tickling Jane Doe, but he insisted that he was not seeking sexual gratification and was simply hugging the child. Dzul also admitted that he was intoxicated at the time of the incident but otherwise maintained his innocence, asserting that any touching of Jane Doe's breasts was inadvertent and unintentional.
After accepting Dzul's Alford guilty plea to one count of attempted lewdness with a child under the age of fourteen years, the district court referred the matter to the Division of Parole and Probation (P&P) for a presentence investigation report (PSI) and ordered Dzul to undergo a psychosexual examination pursuant to NRS 176.135, and NRS 176.139.
As part of the psychosexual evaluation, Dzul interviewed with two psychological professionals to determine whether he represented a menace to the health, safety, or morals of others. Dzul maintained his innocence throughout the interviews. Dr. Dodge Slagle, D.O., concluded that Dzul did not represent a high risk to reoffend and opined that Dzul would not be a menace to the safety, welfare, or morals of others if granted probation as long as he abstained from consuming alcohol. However, licensed social worker John Pacalt opined that Dzul's denial of responsibility for the offense was a factor that increased his risk to reoffend, that Dzul represented a moderate to high risk to reoffend, and that Dzul was therefore a poor candidate for probation.[5] Based upon the reports and his prior conviction for lewdness with a child under the age of fourteen years, the district court refused to grant Dzul probation.[6] The district court thereafter sentenced Dzul to ten years in Nevada State Prison with parole eligibility after four years.

DISCUSSION

I. Miranda warnings prior to the psychosexual evaluation

Dzul contends that the district court erred in considering the psychosexual evaluations because he was not Mirandized before the clinical interview portion of the evaluations in violation of his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel. Dzul asserts that those constitutional rights extend through sentencing, and he urges this court to vacate his sentence and remand this case for re-sentencing after another psychosexual evaluation.
The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment,[7] provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."[8] In Miranda v. Arizona,[9] the United States Supreme Court acknowledged that "the Fifth Amendment privilege *878 is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves."[10] Further, in Mitchell v. United States,[11] the High Court concluded that the Fifth Amendment privilege extends to sentencing proceedings.
Additionally, the Sixth Amendment right to counsel provides every criminal defendant with the right to have representation during each "critical stage" of adversarial proceedings.[12] The United States Supreme Court has concluded that sentencing is such a "critical stage" for purposes of the Sixth Amendment right to counsel.[13]
Dzul cites Estelle v. Smith[14] in support of his position. In Estelle, the United States Supreme Court addressed whether the admission of a psychiatrist's testimony about statements made by a defendant violated the defendant's Fifth Amendment privilege against compelled self-incrimination.[15] The Supreme Court held that a state's attempt to establish a defendant's future dangerousness at the penalty phase of a capital trial by relying on the statements made by him during a pretrial psychiatric evaluation violated his Fifth Amendment right against self-incrimination. The High Court concluded the defendant's statements were inadmissible because he was not advised before the psychiatric examination that he had a right to remain silent or that any statement he made could be used against him at a sentencing proceeding.[16] The Supreme Court further held that a defendant's Sixth Amendment right to counsel attaches when he undergoes a pretrial psychiatric interview because such an interview is a "critical stage" of the proceedings.[17] Finally, the Supreme Court noted that the defendant did not voluntarily consent to the interview and was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what extent the psychiatrist's findings would be used as a result.[18]
Dzul also relies on Brown v. State.[19] In Brown, this court concluded that the appellant was entitled to a new sentencing hearing because the sentencing court abused its discretion under Estelle by basing the appellant's sentence on information obtained from his court-ordered psychological examination, which was performed to determine his competency to stand trial.[20] Specifically, this court held that the sentencing judge improperly relied on findings in the psychological report, on the appellant's unwarned statements to the psychiatrist, as well as on the psychiatrist's conclusions that the appellant was defensive, unwilling to acknowledge his psychological problems, "immature, egocentric, moody, and insecure," lacked self-confidence, likely would act out sexually, and was not falsely convicted as he maintained he was.[21]
We conclude that neither Estelle nor Brown are controlling in this case. Unlike the pretrial psychiatric evaluations ordered in Estelle and Brown, Dzul was interviewed after he entered his plea. Further, he was informed in advance that the psychosexual evaluation was for the purpose of determining his sentence. Moreover, Dzul had the assistance of counsel throughout the proceedings, never invoked his right against self-incrimination, *879 and does not dispute that he was Mirandized when he first spoke with police during their investigation in this case. Nothing in the record indicates that Dzul objected or refused to submit to the psychosexual evaluation when he was interviewed. To the contrary, Dzul signed an acknowledgment of psychosexual evaluation stating that the "psychosexual evaluation shall be used for recommendations regarding sentencing and/or treatment." The acknowledgment form also contained an area that Dzul could have signed to indicate his refusal to consent to the evaluation.
Further, the holding in Estelle was narrowly applied to the facts of that case, as evidenced by the Supreme Court's statements that "[v]olunteered statements ... are not barred by the Fifth Amendment"[22] and "we do not hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered and relied upon to inform a sentencing determination."[23] Although this court has not yet had the opportunity to address this issue, other jurisdictions have determined that Miranda warnings are not required prior to routine presentence interviews.[24]
In particular, the Tenth Circuit Court of Appeals in United States v. Rogers reasoned that routine presentence interviews do not constitute the type of inherently coercive environment and interrogation by the government for which Miranda warnings were designed.[25] The Rogers court further noted that "it is a fair assumption that defendants will be advised by counsel prior to a presentence interview" and "there is no rule which excludes counsel's presence at the interview."[26] The court went on to explain that "at that stage of the proceedings defendants are conversant with their Fifth Amendment rights."[27] Most defendants receive Miranda warnings prior to being charged, and thereafter knowledgeably exercise their right to remain silent.[28] For the same reasons, we conclude that while the right against self-incrimination clearly attaches at a court-ordered presentence psychosexual evaluation, a defendant is not entitled to Miranda warnings prior to the evaluation. Accordingly, we conclude that Dzul's constitutional rights were not violated by the lack of Miranda warnings prior to his interviews with Dr. Slagle and Pacalt. Thus, he is not entitled to a new sentencing hearing based on this contention.

II. Fifth Amendment implications of conditioning the grant of probation on a favorable psychosexual evaluation

Citing no authority, Dzul contends that his Fifth Amendment right against self-incrimination was violated when the district court refused to grant him probation because he received an unfavorable psychosexual evaluation based on his refusal to admit guilt for the offense of conviction.[29] Dzul argues that his denial of guilt was a substantial negative factor considered in Dr. Slagle's and Pacalt's assessments of his risk to reoffend, and whether he is a menace to the health, safety or morals of others. Dzul asserts that he is, in effect, being punished for maintaining his innocence.
NRS 176.139 required Dzul to undergo a presentence psychosexual evaluation as a prerequisite to eligibility for probation.[30] Additionally, the version of NRS 176A.110 in effect in this case prohibited the district court from placing a defendant on probation unless the person who conducted the psychosexual *880 evaluation certified that the defendant was not a menace to the health, safety, or morals of others.[31] Although Dr. Slagle concluded that Dzul was not a menace to the health, safety, and morals of others and recommended probation, the doctor did express some concern over Dzul's denial of responsibility for his actions when intoxicated. Pacalt opined that Dzul's denial of responsibility increased his risk to reoffend. Pacalt's evaluation indicated Dzul's denial was a major factor in Pacalt's finding that Dzul represented a moderate to high risk to reoffend, and that Dzul was therefore a poor candidate for probation. Finally, the record reflects that failure to participate in the clinical interview portion of the evaluation or a refusal to undergo any evaluation results either in an unfavorable recommendation or no recommendation at all. In either case, the sentencing statutes would prohibit the granting of probation.
Dzul argues that this process violated his Fifth Amendment right against self-incrimination because it "penalized" him for maintaining his innocence. While he did not specifically object on constitutional grounds at sentencing, Dzul did complain about unfairness, and this court may address plain error and constitutional error sua sponte.[32]
We have not had the opportunity to evaluate the constitutionality of conditioning probation on a favorable psychosexual evaluation where admission of guilt is a significant factor in receiving a favorable report. Thus, this is an issue of first impression in Nevada.
The Fifth Amendment has long been interpreted to mean that a defendant may refuse "to answer official questions put to him in any ... proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."[33] A defendant therefore retains his Fifth Amendment rights in the sentencing process.[34]
A state may not impose substantial penalties on a person who decides to invoke his right against self-incrimination.[35] Thus, we have held that "[i]mposition of a harsher sentence based upon the defendant's exercise of his constitutional rights is an abuse of discretion."[36] A sentencing court may not draw any adverse inference from a defendant's silence during sentencing.[37]
Dzul never asserted his Fifth Amendment rights during the clinical interviews nor did he refuse to participate in the psychosexual evaluations. Thus, this case is distinguishable from Bushnell and Mitchell because the sentencing judge did not draw any inference from the defendant's invocation of the Fifth Amendment. A person claiming the protection of the Fifth Amendment generally must affirmatively invoke it.[38]
There is an exception to the general rule requiring affirmative invocation of the privilege, however, where the government prevents an individual from asserting his Fifth Amendment privilege by threatening to penalize him should he invoke it.[39] This foreclosure *881 of access to the Fifth Amendment is termed a "classic penalty situation."[40] Dzul contends that conditioning probation upon a favorable psychosexual evaluation creates a classic penalty situation because defendants who invoke their Fifth Amendment rights in the clinical interviews cannot receive a favorable evaluation. They are then "punished" by sentences of mandatory imprisonment. Dzul also argues that a defendant who enters an Alford plea, or maintains his innocence through trial, must admit guilt during the clinical interviews to have a chance of receiving a favorable evaluation and a possibility of probation. He contends this also `punishes' a defendant for asserting his Fifth Amendment rights.
In Minnesota v. Murphy, a "penalty" case involving a defendant's admissions made during a sex offender treatment program required as a condition of probation, the United States Supreme Court addressed the classic penalty situation exception to the general rule that the Fifth Amendment is not self-executing.[41] In Murphy, when the defendant's probation officer questioned him about admissions he had made during the course of treatment regarding an uncharged rape and murder, the defendant confessed to those crimes.[42] After being indicted in a separate criminal case based on those admissions, the defendant sought to suppress his confession on the ground that the statements were compelled because his probation would have been revoked had he refused to answer.[43] While holding that the defendant's confession was not compelled because there was "no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege,"[44] the Supreme Court nonetheless stated:
There is ... a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation ... and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.[45]
Thus, the State cannot "constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege."[46]
Following Murphy, some jurisdictions have found Fifth Amendment violations where sex offenders were required in treatment programs to disclose past misconduct or be subject to revocation of probation.[47] Other courts, however, have denied similar claims where treatment programs were a *882 condition of parole eligibility.[48]
For example, the Eighth Circuit Court of Appeals held in Doe v. Sauer that an inmate's reduced likelihood of parole for refusing to participate in a sex offender program did not constitute a "penalty" sufficient to compel incriminating speech in violation of the Fifth Amendment. Rather, the court categorized the reduced likelihood of parole as the denial of a benefit.[49] In Doe, an incarcerated sex offender brought a 42 U.S.C. § 1983 action alleging that a sex offender treatment program violated his Fifth Amendment right against self-incrimination because it forced him to admit uncharged offenses, as well as the alleged behavior that led to his convictions, in order for the parole board to grant him parole and because his refusal to make the required admissions forced him to serve a longer prison sentence than he otherwise would.[50] The Doe court concluded that while the sex offender program imposed some burden upon the inmate's Fifth Amendment rights, the burden was mitigated by the fact that parole is a benefit that involves relief from a penalty that has already been imposed, i.e., the full period of incarceration to which the defendant was sentenced and acceptance of responsibility relates to rehabilitation, a primary consideration for granting the benefit of parole.[51]
We find the benefit/penalty analysis persuasive in considering Dzul's arguments. Dzul was subject to a mandatory sentence. Probation is a benefit provided by the Legislature in certain sex offense cases only if defendants demonstrate they are not a menace to the health, safety, or morals of others. Moreover, as in Doe, Dzul's statements to the psychological professionals conducting the psychosexual evaluation were voluntary as he had a "choice" to admit or deny responsibility for his crime of conviction or participate in the evaluation. Finally, denial of probation does not follow automatically from Dzul's refusal to admit responsibility, as it is possible to receive a favorable evaluation while maintaining innocence as evidenced by Dr. Slagle's evaluation. Thus, we conclude that Dzul's circumstances, namely, the reduced likelihood of being granted probation for refusing to admit guilt during the psychosexual evaluation. do not present the "classic penalty situation" that renders the Fifth Amendment self-executing.
In rejecting Dzul's contentions, we have also considered federal cases addressing defendants' Fifth Amendment rights in the context of acceptance-of-responsibility reductions under the federal sentencing guidelines. Although these cases are distinguishable, the legal theory underlying them is instructive. Specifically, several courts have distinguished between a denied benefit (an act of leniency) and a penalty (a harsher sentence) and have concluded that denial of a sentencing reduction based on a defendant's refusal to accept responsibility for his actions does not constitute a penalty nor a sentence enhancement and thus does not violate the Fifth Amendment.[52] These decisions rely on a line of United States Supreme Court cases upholding plea bargains and rejecting claims that offers of lower sentences in exchange for guilty pleas impermissibly compel defendants to incriminate themselves[53] as well as on the *883 long-standing practice of sentencing more leniently those defendants who evidence contrition.[54]
In particular, the Supreme Court in Corbitt v. New Jersey rejected a claim that the offer of a lower sentence in exchange for a guilty plea impermissibly compelled a defendant to incriminate himself, stating:
The cases in this Court ... have clearly established that not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid. Specifically, there is no per se rule against encouraging guilty pleas. We have squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea. The plea may obtain for the defendant "the possibility or certainty ... [not only of] a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty ...," but also a lesser penalty than that required to be imposed after a guilty verdict by a jury.[55]
By analogy, we conclude that probation is a form of leniency and that Dzul was not penalized in this case for refusing to admit guilt to the underlying offense during his psychosexual evaluations. Instead, he was not given a benefit that may be extended to defendants who accept responsibility for their wrongs. Probation has been regarded traditionally as a form of leniency.[56] Moreover, "[t]he Fifth Amendment does not insulate a defendant from all `difficult choices' that are presented during the course of criminal proceedings, or even from all choices that burden the exercise or encourage waiver of the Fifth Amendment's right against self-incrimination."[57] Further, presenting a defendant with the choice between admitting responsibility with a greater chance of receiving a favorable psychosexual evaluation or denying responsibility with a greater risk of receiving an unfavorable evaluation is consistent with the historical practice and understanding that a sentence imposed upon a defendant may be shorter if rehabilitation looks more certain and that confession and contrition are the first steps along the road to rehabilitation.[58] Rehabilitation is a key factor in extending leniency to convicted offenders.
We recognize that some federal courts do not distinguish between an act of leniency and a penalty. These courts conclude that denial of a sentencing reduction based upon a defendant's refusal to accept responsibility for his actions constitutes an impermissible penalty in violation of the Fifth Amendment right against self-incrimination.[59] However, even these cases are distinguishable from the instant case. The decisions in United States v. Frierson, United States v. Oliveras, and United States v. Perez-Franco were based on the sentencing judges' denial of sentencing reductions because the defendants refused to make inculpatory statements concerning other crimes or "relevant conduct" for which they were not yet charged.[60] The circuit courts ultimately held that denial of a reduction in sentence could not be based on the defendant's refusal to admit responsibility for conduct that is not included in the conviction.[61] Furthermore, a subsequent decision of at least one of those courts has clarified that a sentencing judge may compel testimony with respect to the offense comprising the conviction for purposes of acceptance-of-responsibility *884 reductions.[62] Dzul was only evaluated upon his denial of guilt for the convicted offense. Thus, Dzul's circumstances are distinguishable from those of Frierson, Oliveras, and Perez-Franco.
Finally, the Supreme Court recently reaffirmed a state's ability to deny benefits to inmates who refuse to participate in sex offender treatment programs.[63] In McKune v. Lile, an incarcerated sex offender was ordered to participate in a sex offender treatment program which required him to complete and sign an "Admission of Responsibility" form. discussing and accepting responsibility for the crime for which he had been sentenced, and to complete a sexual history form detailing all prior sexual activities, including uncharged criminal offenses.[64] If an inmate refused to participate in the program, his privileges would be reduced. including his visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, and his access to a personal television.[65] The inmate refused to participate in the program and brought an action for injunctive relief under 42 U.S.C. § 1983 on the ground that the required disclosures of his criminal history violated his Fifth Amendment right against compelled self-incrimination.[66] A plurality of the Court held that the adverse consequences faced by inmates for refusing to admit responsibility for the crime of conviction and other past offenses were not so severe as to amount to compelled self-incrimination in violation of the Fifth Amendment.[67]
Although it did not utilize a benefit/penalty analysis, the plurality distinguished its prior line of "penalty" cases, stating that the "penalty" cases involved free citizens given the choice between invoking the Fifth Amendment and sustaining their economic livelihood and that "lawful conviction and incarceration necessarily place limitations on the exercise of a defendant's privilege against self-incrimination."[68] The plurality underscored the importance of sex offender treatment programs by recognizing that sex offenders are a serious threat in our country, particularly to our youth.[69] The plurality also acknowledged that psychological professionals agree that clinical rehabilitation programs reduce recidivism, that an important part of these rehabilitation programs is that participants must confront their pasts and accept responsibility for their deviant behavior, and that denial of responsibility is generally regarded as an impediment to successful rehabilitation.[70] The plurality concluded that a sex offender treatment program,
which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life.[71] *885 Justice O'Connor's concurring opinion does not reject the benefit/penalty analysis, but instead distinguished the "penalty" cases and concluded that alteration of the inmate's prison conditions as a result of his failure to participate in the sex offender treatment program was not a penalty sufficiently serious as to constitute compulsion for purposes of the Fifth Amendment privilege against self-incrimination.[72]
Similarly, we recognize the importance of psychosexual evaluations in determining whether a convicted sex offender represents a menace to the health, safety, or morals of others and that denial of responsibility is generally regarded as an impediment to successful rehabilitation that impacts a sex offender's risk to reoffend. Thus, the statutory scheme for granting probation to convicted sex offenders adopted by our Legislature bears a rational relation to Nevada's interest in protecting its citizens, most often children, from recidivist sex offenders. The adverse consequence that may follow from a sex offender's denial of responsibility for his crime of conviction, namely, a greater risk of receiving an unfavorable psychosexual evaluation and being denied probation, does not amount to unconstitutional compulsion.
Finally, we acknowledge that Justice Stevens' dissenting opinion in McKune, maintaining the benefit/penalty analysis, distinguished between a penalty and a benefit and concluded that the inmate's loss of tangible privileges constituted a penalty that compelled the forfeiture of his Fifth Amendment right against self-incrimination.[73] The dissenting opinion expressed concern with the mandatory nature of the sex offender treatment program and the punishment that followed automatically from an inmate's refusal to participate.[74] This is not the situation in the present case. Although Dzul had to participate in the psychosexual evaluation to be considered for probation, he was not required to admit uncharged acts. Moreover, while his denial of responsibility for his crime of conviction increased the risk of an unfavorable psychosexual evaluation, it did not automatically foreclose his opportunity for probation as evidenced by Dr. Slagle's report. Thus, even using the dissent's rationale in McKune, we conclude Nevada's statutory scheme to be a "benefit" not a "penalty."
Based on the foregoing analysis, we conclude that Dzul's circumstances do not present the "classic penalty situation." Defendants face many choices in the course of criminal proceedings, and the pressure to speak in the hope of improving a defendant's chance of being granted probation does not make an interview compelled.[75] We conclude that presenting Dzul with the choice between admitting responsibility for the offense to which he pleaded guilty and increasing the likelihood of receiving a favorable psychosexual evaluation, or denying responsibility for the offense to which he pleaded guilty and reducing the likelihood of a favorable psychosexual evaluation does not violate his Fifth Amendment right against self-incrimination.
NRS 176A.110 provided the district court with the discretion to grant Dzul probation, a benefit that would relieve Dzul from a prison sentence, only if Dzul did not represent a menace to the health, safety, or morals of others. Dzul had the choice to participate in the psychosexual evaluation and to maintain his innocence despite the consequences that could follow from that choice. The acknowledgement form signed by Dzul states that the psychosexual evaluation shall be used for sentencing and/or treatment recommendations and contains an area where Dzul could have signed to indicate his refusal to consent to the evaluation. Dzul was not penalized for maintaining his innocence. Accordingly, we conclude that Dzul's Fifth Amendment right against self-incrimination was not violated, *886 and we therefore affirm the judgment of conviction.
MAUPIN, C.J., and YOUNG, SHEARING, AGOSTI and LEAVITT, JJ., concur.
ROSE, J., dissenting:
The Fifth Amendment privilege against self-incrimination applies to a defendant throughout trial, both during the guilt and the sentencing phases.[1] In this case, Dzul was well aware of his Fifth Amendment right against self-incrimination, but chose to waive it by continuing to assert his innocence. Therefore, while instructive, the cases of Estelle v. Smith[2] and McKune v. Lile[3] are not on point because they addressed the issue of asserting the privilege against self-incrimination and the adverse consequences that flowed from the exercise of that privilege.
Rather, Brown v. State[4] is on point. In Brown, the district court judge used a psychological report administered at Lakes Crossing in sentencing Brown, even though Brown had not been warned that any statements he provided to the health care professional, who wrote the report, could be used against him. At sentencing, the judge demanded that Brown admit his guilt but he refused to do so. We held that "the district court violated [Brown's] Fifth Amendment rights by considering his `lack of remorse' when he still had a constitutional right to maintain his innocence and by threatening a harsher sentence if [Brown] refused to admit his guilt."[5] We, therefore, concluded that "requiring [Brown] to either express remorse or receive a harsher sentence violated [Brown's] Fifth Amendment rights and constituted an abuse of discretion."[6] I conclude that our holding in Brown governs this case.
Here, Dzul's claim that he received a harsher sentence for maintaining his innocence is not as clear as in the Brown case, but the record sufficiently demonstrates that he received a greater penalty because he maintained his innocence. In particular, Dzul maintained his innocence in the sexual psychological interviews, and John Pacalt used it against Dzul in his psychosexual report. The district court considered the psychologists' opinions, and in part, denied Dzul's probation based on Pacalt's report, where he opined that Dzul's denial of responsibility for the offense was a fact that increased Dzul's risk to reoffend. Therefore, I conclude that this case should be remanded for a new sentencing hearing because the district court abused its discretion by considering the fact that Dzul refused to admit guilt when it imposed Dzul's sentence.
The majority's analysis characterizes the choice between probation and prison time as a benefit or a penalty. I think it is better to jettison the benefit/penalty analysis because it seems to be used to sidestep some important constitutional holdings. The choice at sentencing is between two penalties, one is a sentence of probation, where a defendant serves no prison time, and the other is a sentence of prison time. Both are penalties, with one harsher than the other, as Justice Stevens observed in his dissent in Lile: "The plurality's glib attempt to characterize these consequences as a loss of potential benefits rather than a penalty is wholly unpersuasive."[7]
On a similar note, the majority's use of Lile in the present case is unpersuasive. In Lile, an incarcerated sex offender was given the choice to either participate in a sex offender treatment program, which required him to sign an "Admission of Responsibility" form, or refuse to participate and thereby receive a reduction in incentive level and a corresponding transfer from a medium-security to a maximum-security part of the prison.[8] *887 Here, Dzul was given the choice to either admit his guilt and possibly receive a sentence of probation, or maintain his innocence and receive a sentence of prison time.
In the event we are presented with a factual situation as confronted in Estelle and Lile, where a defendant does assert his constitutional rights and that fact is used against him in a psychosexual evaluation, I would prefer to adopt the analysis of Justice Stevens rather than the Rehnquist Court plurality analysis used by the majority in this case. And in doing so, we should bear in mind our decision in Brown and also in McKenna v. State,[9] where this court reversed a murder conviction because the prosecutor presented the testimony of a psychiatrist who had examined McKenna pursuant to a court order to determine his competence to stand trial.
Because I conclude that our holding in Brown governs this case and that Dzul should receive a new sentencing hearing, I respectfully dissent.
NOTES
[1] 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Dzul also raises several other issues, including whether the district court's refusal to grant him probation amounts to cruel and unusual punishment. Based on the record and the briefs filed herein, we conclude that Dzul's remaining contentions on appeal lack merit.
[4] The victim's real name has been changed to protect her identity.
[5] The record reflects that denial of responsibility is a common negative factor used in evaluating the risk of reoffending.
[6] The record indicates that the district court listened to Dzul's objections to Pacalt's report and then stated that even if it were to disregard the Pacalt report, it would still find Dzul was a high risk for reoffending. It is unclear from the record how much credence the district court eventually gave to the Pacalt report.
[7] Malloy v. Hogan, 378 U.S. 1, 6-11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).
[8] U.S. Const. amend. V.
[9] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[10] Id. at 467, 86 S.Ct. 1602.
[11] 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999).
[12] United States v. Wade, 388 U.S. 218, 226-27, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); see also U.S. Const. amend. VI; Gideon v. Wainwright, 372 U.S. 335, 342-45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (indicating the Sixth Amendment right to counsel is applicable to the states through the Fourteenth Amendment).
[13] Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967).
[14] 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).
[15] Id. at 461, 101 S.Ct. 1866.
[16] Id. at 468-69, 101 S.Ct. 1866.
[17] Id. at 470, 101 S.Ct. 1866.
[18] Id. at 470-71, 101 S.Ct. 1866.
[19] 113 Nev. 275, 934 P.2d 235 (1997).
[20] Id. at 288-90, 934 P.2d at 243-45.
[21] Id. at 288, 934 P.2d at 243-44.
[22] 451 U.S. at 469, 101 S.Ct. 1866.
[23] Id. at 469 n. 13, 101 S.Ct. 1866.
[24] See, e.g., U.S. v. Cortes, 922 F.2d 123, 126 (2d Cir.1990); U.S. v. Rogers, 921 F.2d 975, 979-82 (10th Cir.1990); U.S. v. Miller, 910 F.2d 1321, 1326 (6th Cir.1990); Baumann v. United States, 692 F.2d 565, 577 (9th Cir.1982).
[25] 921 F.2d at 979-80.
[26] Id. at 980.
[27] Id.
[28] Id.
[29] Despite the lack of authority, we choose to address the issue because it has been raised in numerous appeals pending before the court.
[30] 1999 Nev. Stat., ch. 310, § 4, at 1286-87; see also NRS 176.139(1) (2001).
[31] 1997 Nev. Stat., ch. 524, § 7, at 2504. NRS 176A.110 was amended in 2001 such that probation is not available unless the person conducting the evaluation certifies that the defendant does not represent a "high risk to reoffend." 2001 Nev. Stat., ch. 345, § 3, at 1638. Our decision in this case is based on the version of NRS 176A.110 in effect prior to the 2001 amendment; however the amendment would have no bearing on our decision.
[32] Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992).
[33] Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); see also U.S. Const. amend. V.
[34] See generally Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (a defendant does not lose his constitutional right against self-incrimination by reason of his conviction of a crime); United States v. Jones, 640 F.2d 284, 287 (10th Cir.1981) (Fifth Amendment offers protection in the sentencing process).
[35] Lefkowitz v. Cunningham, 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977).
[36] Bushnell v. State, 97 Nev. 591, 593, 637 P.2d 529, 531 (1981).
[37] Mitchell, 526 U.S. at 328-30, 119 S.Ct. 1307.
[38] United States v. Monia, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943).
[39] See Murphy, 465 U.S. at 434, 104 S.Ct. 1136.
[40] Id. at 435, 104 S.Ct. 1136.
[41] See id. at 422-23, 434, 104 S.Ct. 1136.
[42] Id. at 423-24, 104 S.Ct. 1136.
[43] See id. at 425, 104 S.Ct. 1136.
[44] Id. at 437, 104 S.Ct. 1136.
[45] Id. at 435, 104 S.Ct. 1136.
[46] Id. at 438, 104 S.Ct. 1136.
[47] See, e.g., Mace v. Amestoy, 765 F.Supp. 847, 850-51 (D.Vt.1991) (holding that probation revocation for failure to complete sex offender program by making full disclosure regarding crimes other than those for which he had been convicted violated probationer's Fifth Amendment right against self-incrimination and that probationer could not be forced to incriminate himself without grant of immunity); State v. Kaquatosh, 600 N.W.2d 153, 158 (Minn.Ct.App.1999) (holding that probationer's Fifth Amendment right against self-incrimination was violated by revocation of probation for failing to complete sex offender program where his failure was due to his refusal to admit his crime of conviction); State v. Fuller, 276 Mont. 155, 915 P.2d 809, 813-16 (1996) (holding that probationer was placed in classic penalty situation when he was required to participate in a sex offender program that required participants to disclose their offense history as a condition of probation); State v. Imlay, 249 Mont. 82, 813 P.2d 979, 985 (1991) (holding that defendant's probation could not be revoked upon failure to complete sex therapy where basis for his failure to complete program was his refusal to admit guilt for crime of conviction). Cf. Warren v. Richland County Circuit Court, 223 F.3d 454, 459 (7th Cir.2000) (holding that revocation of probation for refusal to admit guilt during sex offender treatment did not violate due process or breach plea agreement), cert. denied, 531 U.S. 1168, 121 S.Ct. 1133, 148 L.Ed.2d 999 (2001); Asherman v. Meachum, 957 F.2d 978, 982-83 (2d Cir.1992) (holding that revocation of defendant's supervised home release status for his refusal to answer questions about his crime at scheduled psychiatric evaluation did not violate his Fifth Amendment rights).
[48] Doe v. Sauer, 186 F.3d 903, 906 (8th Cir.1999) (inmate's privilege against self-incrimination was not violated by denial of parole for prisoner's refusal to participate in rehabilitation by admitting guilt); Russell v. Eaves, 722 F.Supp. 558, 560-61 (E.D.Mo.1989) (sex offender program that required inmates to accept responsibility for their crimes in order to be eligible for parole did not violate the Fifth Amendment right against self-incrimination).
[49] 186 F.3d at 906.
[50] Id. at 905.
[51] See id. at 906.
[52] See, e.g., U.S. v. Knight, 96 F.3d 307, 310 (8th Cir.1996); U.S. v. Clemons, 999 F.2d 154, 160-61 (6th Cir.1993); U.S. v. Frazier, 971 F.2d 1076, 1087 (4th Cir.1992); U.S. v. Rogers, 921 F.2d 975, 982-83 (10th Cir.1990); U.S. v. Skillman, 922 F.2d 1370, 1378-79 & n. 11 (9th Cir.1990). But see U.S. v. Frierson, 945 F.2d 650, 659-60 (3d Cir.1991) ("[A]n increase in sentence or a denied reduction in sentence is a penalty in the context of Fifth Amendment jurisprudence.").
[53] Frazier, 971 F.2d at 1083-84 (citing Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989); Corbitt v. New Jersey, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978); Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); Chaffin v. Stynchcombe, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973); Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162; Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).
[54] Id. at 1086.
[55] 439 U.S. at 218-20, 99 S.Ct. 492 (citations and footnotes omitted).
[56] See Frierson, 945 F.2d at 658.
[57] Frazier, 971 F.2d at 1080.
[58] See U.S. v. McQuay, 7 F.3d 800, 802-03 (8th Cir.1993); see also Frazier, 971 F.2d at 1084-85.
[59] See, e.g., Frierson, 945 F.2d at 659-60; U.S. v. Oliveras, 905 F.2d 623, 628, 632 (2d Cir.1990); U.S. v. Perez-Franco, 873 F.2d 455, 462-64 (1st Cir.1989).
[60] Frierson, 945 F.2d at 652-53; Oliveras, 905 F.2d at 625; Perez-Franco, 873 F.2d at 457-58.
[61] Frierson, 945 F.2d at 659; Oliveras, 905 F.2d at 628, 632; Perez-Franco, 873 F.2d at 463-64.
[62] See, e.g., U.S. v. Reyes, 9 F.3d 275, 279-80 (2d Cir.1993) (sentencing court may not compel testimony in respect to any offense other than the offense to which the defendant plea bargained for purposes of acceptance of responsibility sentencing reduction); see also U.S. v. Hicks, 978 F.2d 722, 726 (D.C.Cir.1992) (recognizing that the November 1, 1992, amendment to § 3E1.1 of the federal sentencing guidelines "seems to resolve the confusion" by requiring that a defendant accept responsibility only for the offense of conviction); United States v. Messer, 785 F.2d 832, 834 (9th Cir.1986) (holding that "a court cannot condition leniency upon a defendant's refusal to admit to a crime not charged").
[63] McKune v. Lile, ___ U.S. ___, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (plurality opinion).
[64] Id. at ___, 122 S.Ct. at 2023 (plurality opinion).
[65] Id. (plurality opinion).
[66] Id. (plurality opinion).
[67] See id. at ___, 122 S.Ct. at 2032 (plurality opinion).
[68] Id. at ___ _ ___ 122 S.Ct. at 2027-28 (plurality opinion).
[69] See id. at ___, 122 S.Ct. at 2024 (plurality opinion).
[70] Id. (plurality opinion).
[71] Id. at ___, 122 S.Ct. at 2027 (plurality opinion).
[72] See id. at ___ _ ___, 122 S.Ct. at 2032-34 (O'Connor, J., concurring in judgment).
[73] See id. at ___ _ ___, 122 S.Ct. at 2040-41 (Stevens, J., dissenting).
[74] See id. at ___ _ ___, 122 S.Ct. at 2038-39 (Stevens, J., dissenting).
[75] See Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 287-88, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (death row inmate's pressure to speak at voluntary clemency interview in the hope of improving his chance of being granted clemency did not make the interview compelled).
[1] Estelle v. Smith, 451 U.S. 454, 462, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).
[2] Id.
[3] ___ U.S. ___, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (plurality opinion).
[4] 113 Nev. 275, 934 P.2d 235 (1997).
[5] Id. at 291, 934 P.2d at 245.
[6] Id.
[7] Lile, ___ U.S. at ___, 122 S.Ct. at 2041 (Stevens, J., dissenting).
[8] Id. at ___, 122 S.Ct. at 2023.
[9] 98 Nev. 38, 39, 639 P.2d 557, 558 (1982).